Filed 11/6/13

**<u>CERTIFIED FOR PUBLICATION</u>**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| CLAY PARKER, as Sheriff, etc., et al.,<br><br>    Plaintiffs and Respondents,<br><br>        v.<br><br>STATE OF CALIFORNIA, et al.,<br><br>    Defendants and Appellants. | F062490, F062709<br><br>(Super. Ct. No. 10CECG02116)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  Jeffrey Y. Hamilton, Judge.

Kamala D. Harris, Attorney General, Douglas J. Woods, Senior Assistant Attorney General, Peter A. Krause and Ross C. Moody, Deputy Attorneys General, for Defendants and Appellants.

Michel & Associates, C.D. Michel, Clinton B. Monfort, and Anna M. Barvir for Plaintiffs and Respondents.

Bruce Colodny; and Stephen P. Halbrook for FFLGuard LLC and Gun Owners of California, Inc., as Amicus Curiae on behalf of Plaintiffs and Respondents.

Baker, Manock & Jensen, Douglas Blaine Jensen; and Richard E. Gardiner for Law Enforcement Alliance of America as Amicus Curiae on behalf of Plaintiffs and Respondents.

SEE DISSENTING OPINION

This appeal presents a facial challenge under the void-for-vagueness doctrine to a statutory scheme within the Penal Code[1] regulating the sale, display, and transfer of "handgun ammunition." The statutes at issue, former sections 12060, 12061 and 12318, defined "handgun ammunition" as ammunition "principally for use" in handguns as opposed to rifles and other firearms. In the proceedings below, respondents challenged the constitutionality of these statutes on grounds that they failed to provide adequate notice of the conduct proscribed and lacked sufficiently definite guidelines to prevent arbitrary or discriminatory enforcement by police.

The trial court agreed with respondents, declaring the challenged statutes constitutionally invalid and issuing a permanent injunction against their enforcement. Appellants contend the statutes are not unconstitutional because it is possible to conceive of circumstances in which the statutory language would not be vague. These issues are addressed in the first part of our opinion. The second part of the opinion pertains to the trial court's partial denial of a motion to tax costs filed by appellants after the permanent injunction was issued.[2] We affirm the judgment in full.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

### Statutory Scheme

Former sections 12060, 12061, and 12318 were enacted as part of Assembly Bill No. 962 (2009-2010 Reg. Sess.), known as the Anti-Gang Neighborhood Protection Act of 2009, which implemented a statutory scheme for the transfer and handling of "handgun ammunition." (Stats. 2009, ch. 628, §§ 1-2, 7.) In 2012, Senate Bill 1080

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

[2] F062709 is the appeal of the partial denial of the motion to tax costs. We consolidated F062490 with F062709 for purposes of briefing, oral argument, and decision.

renumbered and reconfigured provisions of the Penal Code relating to deadly weapons, including the challenged statutes.  (Stats. 2010, ch. 711, §§ 4, 6.)  In their briefing, the parties refer to the challenged statutes by their original section numbers.  We will discuss the current versions of all relevant statutes and refer to repealed provisions as former sections of the Penal Code.

A handgun is any pistol, revolver or firearm capable of being concealed upon the person.  (§ 16640, subd. (a).)  The terms "pistol," "revolver," and "firearm capable of being concealed upon the person" are defined in section 16530, which incorporates the language of former section 12001, subdivision (a)(1).  (Stats. 2007, ch. 163, § 1.)  These terms "apply to and include any device designed to be used as a weapon, from which is expelled a projectile by the force of any explosion, or other form of combustion, and that has a barrel less than 16 inches in length.  These terms also include any device that has a barrel 16 inches or more in length which is designed to be interchanged with a barrel less than 16 inches in length."  (§ 16530, subd. (a).)

Section 16650 combines the language of former sections 12060, subdivision (b), and 12323, subdivision (a), to provide the definition of "handgun ammunition."  (See Stats. 2009, ch. 628, § 2; Stats. 1995, ch. 263, § 3.)  As used in the statutory scheme, "'handgun ammunition' means ammunition *principally for use* in pistols, revolvers, and other firearms capable of being concealed upon the person, *notwithstanding that the ammunition may also be used in some rifles*."  (§ 16650, subd. (a), italics added.)

The definition of a "handgun ammunition vendor" is set forth in section 16662, which corresponds to former section 12060, subdivision (c).  (Stats. 2009, ch. 628, § 2.)  A "'handgun ammunition vendor' means any person, firm, corporation, dealer, or any other business enterprise that is engaged in the retail sale of any handgun ammunition, or that holds itself out as engaged in the business of selling any handgun ammunition."  (§ 16662.)

3.

These definitional statutes, particularly section 16650, are essential to the proscriptive language of section 30312 (former § 12318) and sections 30345 through 30365 (former § 12061), all of which impose restrictions on the sale, delivery, and transfer of handgun ammunition. Section 30312 states that "the delivery or transfer of ownership of handgun ammunition may only occur in a face-to-face transaction with the deliverer or transferor being provided bona fide evidence of identity from the purchaser or other transferee." (§ 30312, subd. (a).) Limited exceptions are provided for law enforcement personnel and other qualified individuals. (*Id*., subd. (b).) A violation of section 30312 is a misdemeanor offense. (*Id*., subd. (c).)

Sections 30345 through 30365 regulate the activities of handgun ammunition vendors. For example, a vendor must not allow any employee who cannot lawfully possess a firearm to "handle, sell, or deliver handgun ammunition in the course and scope of employment." (§ 30347.) Handgun ammunition must also remain inaccessible to customers unless they are being assisted by the vendor or a qualified employee. (§ 30350.)

When handgun ammunition is sold or otherwise transferred, the vendor must record multiple categories of information related to the transaction. This process includes obtaining from the buyer or transferee their date of birth, address, telephone number, driver's license number, signature, and right thumbprint. (§ 30352, subd. (a).) Vendors must maintain handgun ammunition sales transaction records and make them available for inspection in accordance with the provisions of sections 30355, 30357, 30360 and 30362. A violation of section 30352, 30355, 30360, or 30362 is a misdemeanor. (§ 30365, subd. (a).)

**Ammunition – Calibers and Cartridges**

The parties' briefing provides a technical overview of ammunition and its usage in different types of firearms. There appears to be a general consensus between both sides as to the following information.

Modern rifles and handguns fire ammunition that consists of three components: a metal casing that holds a bullet, a propellant or powder, and a primer to ignite the powder. The metal casing and its component parts are known as a cartridge. Three terms, in order of specificity, are commonly used to describe the loaded cartridge: ammunition, caliber, and the cartridge's given name, such as ".357 Magnum" or ".257 Roberts."

Relying on the Glossary of the Association of Firearm and Toolmark Examiners, the parties agree that "ammunition" means "one or more loaded cartridges consisting of a primed case, propellant, and with one or more projectiles." The word "caliber" has multiple definitions. When applied to a firearm, it refers to the diameter of the bore of a gun, usually measured in hundredths or thousandths of an inch and typically written as a decimal fraction. (Merriam-Webster's Collegiate Dict. (11th ed. 2011) p. 174.) When applied to ammunition, it can be defined as "the diameter of a bullet or other projectile" (*Ibid*) or "[a] numerical term, without the decimal point, included in a cartridge name to indicate the nominal bullet diameter." (Glossary of the Assn. of Firearm and Toolmark Examiners (2d ed. 1985) p. 32.) There are many different cartridges within a given caliber of ammunition.

**Lawsuit**

In June 2010, the Sheriff for the County of Tehama, Herb Bauer Sporting Goods, Inc., the California Rifle and Pistol Association Foundation, Able's Sporting, Inc., RTG Sporting Collectibles, LLC, and Stephen Stonecipher (collectively respondents) filed a complaint for declaratory and injunctive relief which alleged, in pertinent part, that former sections 12060, 12061 and 12318 were void for vagueness under the due process clause of the Fourteenth Amendment.[3] The complaint was answered by the State of

---

[3] Herb Bauer Sporting Goods, Inc., alleged a second cause of action challenging the statutes as void as applied to it and respondents collectively sought a writ of mandate which was pled as the third cause of action. Neither is at issue in this appeal.

California, the Attorney General for the State of California, and the California Department of Justice (collectively appellants).

Respondents claimed that because virtually all calibers of ammunition can be used safely in both rifles and handguns, the challenged statutes failed to provide any standard whereby a person of ordinary intelligence could understand and determine whether a given caliber of ammunition is "principally for use" in handguns. As such, law enforcement officials would have discretion to subjectively interpret and apply the law, i.e., the ability to decide for themselves which calibers of ammunition qualify as "handgun ammunition." Appellants admitted in their Answer that some calibers can be used in both rifles and pistols, but generally denied there was any confusion surrounding which calibers are "principally for use" in handguns or that the statutes conferred unbridled discretion upon law enforcement officers.

Respondents propounded a special interrogatory to appellants asking for a list of the types of ammunition they considered to be "handgun ammunition" under the statutory scheme. Appellants objected to the word "types" as being vague and ambiguous, but identified 11 different calibers. As discovery progressed, respondents' expert opined that ammunition is more accurately distinguished by cartridge type, rather than by caliber, because within each caliber there is "a wide range of cartridge lengths, bullet weights, velocity, power, applications and true bullet diameters." Appellants' expert later identified 16 cartridges as being "handgun ammunition" within the meaning of the challenged statutes.

In December 2010, respondents filed a motion for summary judgment and alternatively moved for summary adjudication of the separate causes of action in the complaint. The parties agreed to an expedited briefing schedule in order to allow the motion to be heard before the challenged statutes took effect in February 2011.

**Motion for Summary Judgment/Summary Adjudication**

**Respondents' Evidence**

Respondents moved for summary adjudication of the first cause of action on grounds that the challenged statutes were unconstitutionally vague for failure to sufficiently define "handgun ammunition," i.e., the concept of ammunition that is "principally for use" in handguns as opposed to other types of firearms. The motion was supported by the following evidence:

1. The legislative history of Senate Bill No. 1276 (1993-1994 Reg. Sess.), a failed measure introduced in 1994 to amend and add Penal Code sections relating to ammunition. Respondents highlighted the following comments from the Bill Analysis conducted by the Senate Committee on the Judiciary regarding the "principally for use" language that now appears in section 16650: "It may be assumed that many ammunition calibers are suitable for both rifles and handguns. Without additional statutory guidance, it may be very difficult for dealers to determine which ammunition is 'handgun ammunition'…."

2. Hundreds of pages of reference material pertaining to firearms and ammunition, including excerpts from "Cartridges of the World," a guide to over 1,500 firearm cartridges.

3. Appellants' discovery responses containing the list of 11 calibers of ammunition they considered to be "handgun ammunition." The calibers identified were as follows: ".45, 9mm, 10mm, .40, .357, .38, .44, .380, .454, .25, [and] .32."

4. Transcript excerpts from the deposition of appellants' firearms and ammunition expert, Blake Graham, who verified discovery responses containing the aforementioned list of 11 calibers in his capacity as Special Agent Supervisor for the California Department of Justice, Bureau of Firearms.

5. The declaration of respondents' firearms and ammunition expert, Stephen Helsley, the former Chief of the California Department of Justice (DOJ) Bureau of Forensic

7.

Services and former Assistant Director of the DOJ Investigation and Enforcement Branch. Mr. Helsley attested that virtually all modern ammunition can be used interchangeably in a rifle or a handgun, and whether a given cartridge is used in one or the other is ultimately determined by the "needs and desires of the end user." He further declared: "There is no generally accepted definition of 'handgun ammunition,' nor any commonly understood delineation between 'handgun ammunition' and other ammunition used in the firearms industry, let alone one that allows [a person] to determine whether certain cartridges are 'principally for use' in handguns."

6. Declarations by executive officers of five out-of-state ammunition vendors who sell to California residents, each of whom declared that they did not know and could not determine what ammunition is "principally for use" in handguns under the challenged statutes.

7. Declarations by Tom Allman, the Sheriff-Coroner for the County of Mendocino, and Clay Parker, who at the time was the Sheriff for the County of Tehama. Both officials declared that they did not know and were incapable of determining what ammunition is "principally for use" in handguns, and therefore could not equitably enforce the challenged provisions of the statutory scheme.

8. The declaration of respondent Steven Stonecipher, a Fresno County resident who had transferred and received ammunition by mail within California.
Mr. Stonecipher declared that he did not know how to interpret the challenged statutes, nor was he aware "of any source from which [he] could determine what ammunition suitable for use in both rifles and handguns is principally for use in a handgun."

9. The declaration of Barry Bauer, president of Herb Bauer Sporting Goods, Inc., a vendor in Fresno County that sells hundreds of distinct ammunition cartridges that can be used interchangeably between handguns and rifles. Mr. Bauer declared that

8.

he did not know and could not determine what ammunition is "principally for use" in handguns within the meaning of the challenged statutes.

**Appellants' Evidence**

Appellants submitted the following evidence in support of their opposition to the motion for summary judgment/summary adjudication:

1. Transcript excerpts from the deposition of Barry Bauer wherein he testified that in his personal experience, the following cartridges were used more often in handguns than in rifles: .45 ACP, .45 GAP,[4] 9-millimeter Luger, 10-millimeter Smith & Wesson, .40 Smith & Wesson, .25 ACP, .32 ACP, and .380 ACP.

2. Transcript excerpts from the deposition of respondents' firearms and ammunition expert, Stephen Helsley, wherein he testified that in his personal experience, .25 ACP cartridges were used more often in handguns than in rifles.[5]

3. Transcript excerpts from the deposition of then Tehama County Sheriff Clay Parker wherein he testified that in his personal experience, .40-caliber ammunition was used more often in handguns than in long guns, as were the following cartridges: .45 ACP, .25 ACP, .32 ACP, .38 Special, .40 caliber, and .380 ACP. Sheriff Parker also testified that he had never visited a gun dealer or ammunition vendor in Tehama County to determine compliance with

---

[4] ACP is the acronym for automatic Colt pistol; GAP is the acronym for Glock automatic pistol.

[5] Appellants' opposition papers claimed Mr. Helsley also gave similar testimony with respect to the following cartridges: .45 GAP, 9-millimeter Federal, 10-millimeter Auto, .357 SIG, .44 Auto Mag and .38 Smith & Wesson. The record on appeal does not appear to contain deposition transcript excerpts corresponding to such testimony.

9.

California's gun laws.  He left such enforcement duties to the California Department of Justice.

4. Transcript excerpts from the deposition of respondent Steven Stonecipher wherein he testified that in his experience, the following cartridges were used more often in handguns: .45 ACP, .380 ACP, 9-millimeter Luger, 10-millimeter Smith & Wesson, .40 Smith & Wesson, .25 ACP, .32 ACP, .357 SIG and .454 Casull.

5. The declaration of the appellants' firearms expert, Blake Graham, wherein he identified the following 16 cartridges as "handgun ammunition" within the meaning of the challenged statutes:  .45 ACP (also known as 45 Auto and 45 Automatic + P), .45 GAP, 9-millimeter Luger (also known as 9x19mm, 9mm Parabellum and 9mm Luger +P), 10-millimeter Automatic, 40 S&W Automatic, .357 Magnum (also known as 357 Smith & Wesson Magnum), .357 SIG, .38 Special (also known as 38 Special + P, 38 Smith & Wesson Special, and .38 Colt Special), .38 Super (also known as 38 Super Automatic and 38 Super Automatic + P), .44 Remington Magnum (44 Magnum), .44 Smith & Wesson Special, .44 Auto Mag, .380 ACP (also known as 380 Auto, 9mm Kurz, 9 x 17 mm), .454 Casull, .25 ACP (also known as 25 Auto) and .32 ACP (also known as 32 Auto).  According to Mr. Graham, very few long guns fire these particular cartridges.  However, he acknowledged there were other cartridges for which he could not determine if they were "principally for use" in handguns without engaging in further research and analysis (e.g., all .22-caliber ammunition).

Mr. Graham's declaration described the methodology he used to compile the list of 16 cartridges: "The starting point for my analysis was the DOJ's Dealer Record of Sale and Automated Firearm System databases, which contain information on all handguns purchased or transferred in California each year.

10.

Specifically, I asked an analyst to run a report for me from those databases that reflected how many handguns in each particular caliber were sold over the last five years. The report that was generated was used as a starting point to show which handgun calibers have been most common in terms of handgun sales over the past several years. My experience and expertise was then applied to narrow the list of calibers down to those cartridges that are principally used in pistols and revolvers."

6. In further support of their opposition, appellants requested judicial notice of printouts from websites of certain vendors who market cartridges as "handgun ammunition" and "rifle ammunition."

Respondents' objections to the request for judicial notice were overruled by the trial court.

## Trial Court's Ruling

The trial court granted respondents' motion for summary adjudication of their cause of action for declaratory and injunctive relief, which it characterized as a "facial vagueness challenge." The term "handgun ammunition" was held to be unconstitutionally vague as used within former sections 12060, 12061, and 12318, thus invalidating the statutory scheme regulating the display, transfer, and sale of such ammunition. A two-part analysis formed the basis for this ruling.

The trial court first sought to determine whether the language of the challenged statutes was sufficiently definite to provide adequate notice of the conduct it proscribed. After examining relevant case law, available legislative history, and the text of the provisions in question, the court found the Legislature's definition provided "no objective way or method" for an ordinary citizen or ammunition vendor to determine whether a given caliber or cartridge is used more often in handguns than in rifles or other firearms. "Consequently, [former sections] 12060, 12061 and 12318 fail[ed] to meet the first

11.

requirement for a constitutionally valid criminal statute – that the statute be definite enough so that ordinary people can understand what conduct is prohibited."

Next, the court considered whether the statutes contained minimal standards or guidelines to govern law enforcement officers. None were found. In the trial court's view, the Legislature "simply left it open to the personal judgment call and subjective understanding of each individual law enforcement officer to determine if a particular caliber and/or cartridge of ammunition is 'handgun ammunition' under the definition in [the statutory scheme] and to subjectively apply that [definition] to each issue of an ammunition sale or transfer that comes to the attention of that law enforcement officer."

Pursuant to the summary adjudication ruling, a permanent injunction was entered effective February 2011 barring enforcement of the challenged statutes. Respondents were awarded their costs of suit as the prevailing party. Appellants' timely appeal followed.

## STANDARD OF REVIEW

Orders granting summary judgment and summary adjudication are reviewed de novo. (*Aguilar v. Atlantic Richfield Co*. (2001) 25 Cal.4th 826, 860; *Lafferty v. Wells Fargo Bank* (2013) 213 Cal.App.4th 545, 556.) The same is true for all questions of law. (*American Nurses Assn. v. Torlakson* (2013) 57 Cal.4th 570, 575.) "The interpretation of a statute and the determination of its constitutionality are questions of law." (*People v. Health Laboratories of North America, Inc.* (2001) 87 Cal.App.4th 442, 445.) Accordingly, we apply the de novo standard of review.

## DISCUSSION

We must answer two questions in this portion of the appeal. First, what is the appropriate standard for analyzing a facial challenge to the constitutionality of a criminal statute in the context of the void-for-vagueness doctrine? Second, are the challenged statutes unconstitutionally vague?

12.

To answer the first question, we examine a number of pivotal United States Supreme Court opinions and attempt to harmonize the holdings of those cases with California law, despite a lack of clarity in both lines of authority. Outside of disputes involving First Amendment rights, and to a lesser extent abortion, facial challenges (as opposed to "as applied" challenges) are often evaluated using a standard articulated in *United States v. Salerno* (1987) 481 U.S. 739 (*Salerno*). Under the *Salerno* standard, the challenger must establish "that no set of circumstances exists under which the [statute] would be valid." (*Salerno*, at p. 745.) Appellants contend the *Salerno* standard governs this case.

The *Salerno* standard is prevalent in federal court, but not universally controlling. Both the United States and California Supreme Courts have found certain circumstances warrant heightened scrutiny of legislative enactments, and thus a more lenient standard of review. Facial challenges of the latter variety are permitted "[w]hen vagueness permeates the text" of a criminal statute that contains no scienter requirement and implicates constitutionally protected activity. (*City of Chicago v. Morales* (1999) 527 U.S. 41, 55 (plur. opn. of Stevens, J.) (*Morales*); see also, *Kolender v. Lawson* (1983) 461 U.S. 352, 358, fn. 8 (*Kolender*).) California's version of the alternative standard asks whether a statute is constitutionally invalid "in the *generality* or *great majority* of cases." (*San Remo Hotel L.P. v. City & County of San Francisco* (2002) 27 Cal.4th 643, 673 (*San Remo*), italics in original.)

We do not believe the California Supreme Court has ever endorsed the *Salerno* standard, nor are we entirely convinced that *Salerno* cannot be reconciled with the heightened scrutiny traditionally applied to criminal statutes under the void-for-vagueness doctrine insofar as an inherently vague statute will render the law unconstitutional in all circumstances. In any event, we reject appellants' argument that the challenged statutes are valid so long as we can conceive of at least one scenario in which the "principally for use" language would not be vague. Under this interpretation

13.

of the *Salerno* standard, the existence of a single cartridge (out of hundreds or thousands) that is used more often in handguns than in rifles would allow these criminal statutes to pass constitutional muster even if vagueness "permeates the text" of their provisions and leaves citizens of ordinary intelligence without fair notice of the conduct proscribed. If the *Salerno* standard actually compels such a result, it surely conflicts with the basic requirements of due process in this instance. Therefore, we apply the principles outlined by the United States Supreme Court in opinions such as *Kolender* and *Morales,* discussed *infra,* and apply California's more lenient standard to determine whether the statutes are vague "in the generality or great majority of cases."

As to the second question, our analysis follows traditional rules of statutory interpretation and the two-pronged test for vagueness that was utilized by the trial court. We ultimately conclude the statutes lack the degree of certainty required by constitutional guarantees of due process.

**Facial vs. "As Applied" Challenges**

"A facial challenge to the constitutional validity of a statute or ordinance considers only the text of the measure itself, not its application to the particular circumstances of an individual." (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084 (*Tobe*).) The relief typically sought is total invalidation of the law. Therefore, cases hold that the challenger must demonstrate "a present total and fatal conflict with applicable constitutional prohibitions." (*Ibid.*, citations and internal quotations marks omitted.)

In contrast, an "as applied" challenge "involves an otherwise facially valid measure that has been applied in a constitutionally impermissible manner." (*California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 277 (conc. & dis. opn. of Cantil-Sakauye, C.J.) (*Matosantos*).) This type of challenge "contemplates analysis of the facts of a particular case or cases to determine the circumstances in which the statute or ordinance has been applied and to consider whether in those particular circumstances

14.

the application deprived the individual to whom it was applied of a protected right."
(*Tobe*, *supra*, 9 Cal.4th at p. 1084.)

Appellants note that facial challenges to legislation are disfavored. The United States Supreme Court has identified several policy considerations in this regard. "Claims of facial invalidity often rest on speculation. As a consequence, they raise the risk of premature interpretation of statutes on the basis of factually barebones records. Facial challenges also run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." (*Washington State Grange v. Washington State Republican Party* (2008) 552 U.S. 442, 450-451, internal citations and quotation marks omitted.)

While these principles apply to facial challenges in general, competing policy concerns must be taken into account when an attack is made under the void-for-vagueness doctrine. If a statute is objectively vague such that it cannot be understood by ordinary citizens for whom it poses a threat of criminal liability, questions of constitutional due process are neither speculative nor premature. This explains why the high court has been willing to resolve facial challenges for at least the better part of a century, albeit on a limited basis. (See, e.g., *Lanzetta v. New Jersey* (1939) 306 U.S. 451, 453 (*Lanzetta*) [striking down a criminal statute as unconstitutionally vague on its face]; *Connally v. General Constr. Co.* (1926) 269 U.S. 385, 391 (*Connally*) [same].)

**Void-For-Vagueness Doctrine**

"The requirement of a reasonable degree of certainty in legislation, especially in the criminal law, is a well established element of the guarantee of due process of law." (*People v. Superior Court* (*Caswell*) (1988) 46 Cal.3d 381, 389 (*Caswell*), quoting *In re Newbern* (1960) 53 Cal.2d 786, 792.) This is the foundation of the void-for-vagueness doctrine. The doctrine arises from due process protections under the United States and

California Constitutions. (*Ibid*.; U.S. Const., 5th & 14th Amends.; Cal. Const., art. I, § 7.) "The vagueness may be from uncertainty in regard to persons within the scope of the [statute] . . . or in regard to the applicable tests to ascertain guilt." (*Winters v. New York* (1948) 333 U.S. 507, 515-516.)

A commonly cited formulation of the doctrine is stated in *Connally*. There, a criminal statute punishing contractors who paid their workers less than the "'current rate of per diem wages in the locality where the work is performed'" was found unconstitutionally vague on its face. (*Connally, supra,* 269 U.S. at p. 393.) The court held that "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." (*Id*. at p. 391.)

In California, criminal statutes must satisfy two requirements to withstand a facial vagueness challenge under the due process clause. "First, a statute must be sufficiently definite to provide adequate notice of the conduct proscribed." (*Caswell*, *supra*, 46 Cal.3d at p. 389.) "Second, a statute must provide sufficiently definite guidelines for the police in order to prevent arbitrary and discriminatory enforcement." (*Id*. at p. 390.)

These basic requirements are distilled from several decades of jurisprudence. (See *Caswell*, *supra*, 46 Cal.3d at pp. 389-390.) As stated in *Grayned v. City of Rockford* (1972) 408 U.S. 104 (*Grayned*), "[v]ague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning." (*Id.* at p. 108.)

"Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory

16.

application.  Third… [u]ncertain meanings inevitably lead citizens to steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked." (*Grayned*, *supra,* 408 U.S. at pp. 108-109, footnotes and internal quotation marks omitted.)

## Standard of Review for Facial Challenges - U.S. Supreme Court Cases

A. *Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc*. (1982) 455 U.S. 489

The case of *Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc*. (1982) 455 U.S. 489 (*Hoffman Estates*) involved a local ordinance requiring businesses to obtain a license in order to sell items "'designed or marketed for use with illegal cannabis or drugs.'"  (*Hoffman Estates*, at p. 491.)  A shop owner challenged the facial validity of the statute on grounds of unconstitutional vagueness and overbreadth.  (*Ibid*.)  The Supreme Court rejected both arguments.

The opinion is noteworthy for its attempt to establish an analytical framework for certain types of facial challenges:  "In a facial challenge to the overbreadth and vagueness of a law, a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct.  If it does not, then the overbreadth challenge must fail.  The court should then examine the facial vagueness challenge and, *assuming the enactment implicates no constitutionally protected conduct*, should uphold the challenge only if the enactment is impermissibly vague in all of its applications." (*Hoffman Estates*, *supra,* 455 U.S. at pp. 494-495, italics added & fns. omitted.)  The Supreme Court also emphasized that "[i]n reviewing a business regulation for facial vagueness…the principal inquiry is whether the law affords fair warning of what is proscribed."  (*Id*. at p. 503.)

Applying the test described above, the Court first determined the ordinance did not reach constitutionally protected conduct.  (*Hoffman Estates*, *supra,* 455 U.S. at p. 497.) Consequently, a finding of unconstitutional vagueness required proof that the law was

17.

"impermissibly vague in all of its applications." (*Ibid*.) Notwithstanding this pronouncement, the Court acknowledged that the standards for evaluating vagueness should not be "mechanically applied," and "[t]he degree of vagueness that the Constitution tolerates…depends in part on the nature of the enactment. Thus, economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow…". (*Id*. at p. 498.)

There is "greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe… [A] scienter requirement may [also] mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." (*Hoffman Estates*, *supra,* 455 U.S. at pp. 498-499, fns. omitted.) Although characterized as "quasi-criminal," the ordinance at issue in *Hoffman Estates* contained a scienter requirement and imposed only civil penalties. (*Id*. at p. 499.) The ordinance was also found to be sufficiently clear on its face. (*Id*. at p. 501.) Therefore, any "speculative danger of arbitrary enforcement" did not render the ordinance void for vagueness. (*Id*. at p. 503.)

Despite use of the language "impermissibly vague in all of its applications," *Hoffman Estates* recognizes the existence of a more lenient standard of review for criminal statutes, especially when those statutes implicate constitutionally protected conduct. This was confirmed in the subsequent opinion of *Kolender v. Lawson*.

B.  *Kolender v. Lawson* (1983) 461 U.S. 352

The defendant in *Kolender* was convicted under a section of the California Penal Code requiring persons who loiter or wander on streets to provide "credible and reliable" identification when requested by a police officer. (*Kolender*, *supra,* 461 U.S. at p. 353.) The Supreme Court found the statute unconstitutionally vague on its face within the meaning of the due process clause of the Fourteenth Amendment for failure to clarify what was contemplated by the term "credible and reliable." (*Id*. at pp. 353-354.) The opinion discusses two aspects of the void-for-vagueness doctrine – adequate notice to

18.

citizens and minimal guidelines to govern law enforcement – and places greater emphasis on the latter. (*Id*. at p. 358.)

"Where the [L]egislature fails to provide such minimal guidelines, a criminal statute may [improperly] permit a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections." (*Kolender*, *supra,* 461 U.S. at p 358, citation & quotation marks omitted.) The language of the anti-loitering statute created the potential for arbitrary suppression of First Amendment liberties and also implicated the constitutional right to freedom of movement. (*Ibid*.) As a result, "the full discretion accorded to the police to determine whether the suspect ha[d] provided a 'credible and reliable' identification necessarily entrust[ed] lawmaking to the moment-to-moment judgment of the policeman on his beat… and furnishe[d] a convenient tool for harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure." (*Id*. at p. 360, citations and quotation marks omitted.)

With regard to the standard of review, the majority opinion in *Kolender* makes a point to clarify its use of the phase "impermissibly vague in all of its possible applications" as stated in *Hoffman Estates*. "First…we permit a facial challenge if a law reaches 'a substantial amount of constitutionally protected conduct.' Second, where a statute imposes criminal penalties, the standard of certainty is higher. This concern has, at times, led us to invalidate a criminal statute on its face even when it could conceivably have had some valid application." (*Kolender*, *supra,* 461 U.S. at p. 358, fn. 8, citations omitted.) The anti-loitering statute was held unconstitutional despite at least one set of circumstances in which compliance with the requirement to provide "credible and reliable" identification would not be vague, i.e., a citizen's absolute refusal to provide any identification at all. (*Id*. at pp. 371-372 (dis. opn. of White J..)

C. _United States v. Salerno_ (1987) 481 U.S. 739

The _Salerno_ case involved a facial challenge to the Bail Reform Act (18 U.S.C. §§ 3141-3150, 3156 (1982 & Supp. III 1993)). (_Salerno_, _supra,_ 481 U.S. at p. 746.) The relevant provisions of the Act authorized pretrial detention of arrestees upon a judicial officer's determination that alternative procedures would not "reasonably assure the appearance of the person as required and the safety of any other person and the community." (_Id_. at p. 742.) The criminal defendants who challenged the Act argued these provisions allowed pretrial punishment in violation of their due process rights under the Fifth Amendment and violated the excessive bail clause of the Eighth Amendment. (_Id_. at p. 746.)

The _Salerno_ opinion is best known not for its evaluation of the Bail Reform Act, but for a statement made prior to its analysis of the merits. The majority stated: "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." (_Salerno_, _supra,_ 481 U.S. at p. 745.) The provisions at issue were ultimately found to be constitutional.

The _Salerno_ opinion has received "severe and pervasive criticism" for its description of an unqualified "no set of circumstances" standard for facial constitutional challenges. (Isserles, _Overcoming Overbreadth: Facial Challenges and the Valid Rule Requirement_ (1998) 48 Am.U. L.Rev. 359, 372.) Many courts and legal scholars agree that in practical application, the standard will almost always be impossible to satisfy. (See, e.g., _Greenville Women's Clinic v. Comm'r, S.C. Dep't of Health_ (4th Cir. 2002) 317 F.3d 357, 372, fn. 4 (dis. opn. of King, J.) ["In _United States v. Salerno_ … the Supreme Court articulated a 'no set of circumstances' test that would, if applicable, make a facial challenge virtually impossible to win. However, the _Salerno_ doctrine is an embattled one at best, and its continuing viability is the subject of intense debate"]; see

20.

also, Dorf, *Facial Challenges to State and Federal Statutes* (1994) 46 Stan. L.Rev. 235, 236-240.)

In 1996, the United States Supreme Court denied a petition for certiorari in a case entitled *Janklow v. Planned Parenthood, Sioux Falls Clinic* (1996) 517 U.S. 1174, [116 S.Ct. 1582]. Justice John Paul Stevens issued a concurring memorandum in conjunction with the denial of certiorari for the sole purpose of criticizing the language used in *Salerno*. He wrote that the "no set of circumstances" statement "was unsupported by citation or precedent…[,] does not accurately characterize the standard for deciding facial challenges, and neither accurately reflects the Court's practice with respect to facial challenges, nor is it consistent with a wide array of legal principles." (*Janklow, supra,* 116 S.Ct. at p. 1583, citations and quotations omitted.) Justice Stevens further noted this "rigid and unwise dictum has been properly ignored in subsequent cases…." (*Ibid*.)

D. *City of Chicago v. Morales* (1999) 527 U.S. 41

In *Morales*, a plurality of the United States Supreme Court struck down an anti-loitering statute as facially unconstitutional without considering whether any set of circumstances existed under which the statute would be valid. The plurality opinion also addressed the question of whether, and to what extent, a facial challenge could be considered outside the context of the First Amendment. (*Morales*, *supra,* 527 U.S. at pp. 52-53.)

Citing *Kolender*, the plurality's analysis begins by noting that "even if an enactment does not reach a substantial amount of constitutionally protected conduct, it may be impermissibly vague because it fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests." (*Morales*, *supra,* 527 U.S. at p. 52.) The City of Chicago's anti-loitering ordinance implicated the right to freedom of movement, which is a liberty interest protected by the due process clause of the Fourteenth Amendment. (*Id*. at p. 53.) After describing this liberty interest in greater detail, the opinion states: "it is clear that the vagueness of this

21.

enactment makes a facial challenge appropriate. This is not an ordinance that simply regulates business behavior and contains a scienter requirement. It is a criminal law that contains no *mens rea* requirement and infringes on constitutionally protected rights. When vagueness permeates the text of such a law, it is subject to facial attack." (*Id*. at p. 55, citations, quotation marks & fn. omitted.)

Both aspects of the void-for-vagueness doctrine justified a facial challenge to the ordinance. With respect to the fair notice requirement, the Court reiterated that "[n]o one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes." (*Morales*, *supra,* 527 U.S. at p. 58, quoting *Lanzetta*, *supra*, 306 U.S. at p. 453.) "The Constitution does not permit a legislature to 'set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large.'" (*Morales*, 527 U.S. at p. 60.) The broad sweep of the ordinance also violated the rule that legislatures must establish minimal guidelines to govern law enforcement. (*Id*. at pp. 60-62.)

The *Morales* plurality rejected the *Salerno* standard. "To the extent we have consistently articulated a clear standard for facial challenges, it is not the *Salerno* formulation, which has never been the decisive factor in any decision of this Court, including *Salerno* itself… Since we, like the Illinois Supreme Court, conclude that vagueness permeates the ordinance, a facial challenge is appropriate." (*Morales*, *supra,* 527 U.S. at p. 54, fn. 22.) However, three Justices endorsed the *Salerno* standard in dissenting opinions. (*Id*. at pp. 78-83 (Scalia, J., dissenting) and at p. 111 (Thomas, J., joined by Rehnquist, C.J. and Scalia, C.J., dissenting).)

Justice Stephen Breyer did not join in the plurality's rejection of the *Salerno* rule, but presented the following analysis in a concurring opinion: "I believe the ordinance violates the Constitution because it delegates too much discretion to a police officer to decide whom to order to move on, and in what circumstances. And I see no way to distinguish in the ordinance's terms between one application of that discretion and

22.

another.  The ordinance is unconstitutional, not because a policeman applied this discretion wisely or poorly in a particular case, but rather because the policeman enjoys too much discretion in *every* case.  And if every application of the ordinance represents an exercise of unlimited discretion, then the ordinance is invalid in all its applications." (*Morales*, *supra,* 527 U.S. at p. 71 (conc. opn. of Breyer, J.).)

The plurality concluded it did not need to resolve the viability of the *Salerno* rule, which it characterized as a species of third-party standing, because *Morales* arose from a state court decision rather than a federal court decision.  Under the plurality's analysis, state courts are not obligated to follow the *Salerno* standard.  (*Morales*, *supra,* 527 U.S. at p. 55, fn. 22 ["Whether or not it would be appropriate for federal courts to apply the *Salerno* standard in some cases – a proposition which is doubtful – state courts need not apply prudential notions of standing created by this Court.  Justice Scalia's assumption that state courts must apply the restrictive *Salerno* test is incorrect as a matter of law; moreover it contradicts 'essential principles of federalism.'"], citation omitted.)

E.  Current State of the Law

The United States Supreme Court has yet to resolve the question of whether a definitive standard of review exists for all facial challenges outside of the First Amendment context.  (*United States v. Stevens* (2010) 559 U.S. 460, 472 ["Which standard applies in a typical case is a matter of dispute…"].)

**Standard of Review for Facial Challenges - California Cases**

California has historically recognized a distinction similar to the one expressed in *Hoffman Estates*, *Kolender*, and *Morales* with respect to facially vague statutes.  A discussion found in *Franklin Life Ins. Co. v. State Bd. of Equalization* (1965) 63 Cal.2d 222, is illustrative.  "[T]his court, in certain circumstances, will hold a statute unconstitutional on its face without regard to the particular facts of the case… Thus when the application of the statute is invalid in certain situations[,] we cannot enforce it in other situations if such enforcement entails the danger of an uncertain or vague future

23.

application of the statute. We have been particularly aware of fomenting such danger of uncertainty in the application of a statute which would inhibit the exercise of a constitutional right or impose criminal liability." (*Id*. at pp. 227-228, citations omitted.)

Another example, which is cited by respondents, is the summary of law set forth in *In re Marriage of Siller* (1986) 187 Cal.App.3d 36 (*Siller*). "[A] statute is not facially unconstitutional simply because it may not be constitutionally applied to some persons or circumstances; at a minimum, its unlawful applications must be substantial and real when judged in relation to the statute's plainly legitimate sweep. Indeed, it has been said that a statute will be upheld against facial attack if an appellate court can conceive of a situation in which the statute could be applied without entailing an inevitable collision with, and transgression of, constitutional provisions." (*Id*. at pp. 48-49, citations omitted.)

"Unless a statute facially tenders a present total conflict with constitutional provisions, any overbreadth in a statute is ordinarily cured through case-by-case analysis of the fact situations to which the statute is applied. However, an exception to this latter rule has been recognized for statutes imposing criminal liability or impinging upon constitutional rights (usually of free speech). Statutes of this latter variety may be declared invalid in their entirety if piecemeal adjudication of the legality of the statute would entail the vague or uncertain future application of the statute, thereby inhibiting the exercise of constitutional rights." (*Siller*, *supra*, 187 Cal.App.3d at p. 49, citations omitted.)

This line of authority is somewhat dated given that it ends in 1986. The waters have been muddied in the wake of the *Salerno* opinion in 1987 and the *Morales* opinion in 1999. The California Supreme Court has on several occasions recognized its own inconsistency in using different levels of review for facial challenges. (See, e.g., *Matosantos*, *supra*, 53 Cal.4th at p. 278 ["[W]e have sometimes articulated differing standards"]; *Guardianship of Ann S*. (2009) 45 Cal.4th 1110, 1126 (*Ann S*.) ["The

standard governing facial challenges has been a matter of some debate, within both this court and the United States Supreme Court."].)

Under the strictest standard, a statute will not be considered facially invalid unless its provisions present "a total and fatal conflict with applicable constitutional prohibitions in all of its applications." (*East Bay Asian Local Development Corp. v. State of California* (2000) 24 Cal.4th 693, 709, quotation marks omitted; *California Teachers Assn. v. State of California* (1999) 20 Cal.4th 327, 338; *Tobe*, *supra*, 9 Cal.4th at p. 1084.) Our district has characterized this standard as a "*Salerno*-type approach to facial constitutional challenges in general." (*Sanchez v. City of Modesto* (2006) 145 Cal.App.4th 660, 679 (*Sanchez*).) However, California's strictest test is technically distinct from the *Salerno* rule and consistent with the void-for-vagueness exceptions recognized in *Kolender* and *Morales*. This is so because a criminal statute that is objectively vague, such that ordinary citizens and police alike must necessarily guess at its meaning and differ as to its application, violates due process as a matter of law. (See *Connally*, *supra*, 269 U.S. at p. 391.) The inherent violation of due process renders the statute totally and fatally in conflict with applicable constitutional prohibitions.[6]

Under the more lenient standard, one may successfully challenge the facial validity of a statute by demonstrating a conflict with constitutional protections "in the *generality* or *great majority* of cases." (*San Remo*, *supra*, 27 Cal.4th at p. 673, italics in original; see also, *Ann S.*, *supra*, 45 Cal.4th at p. 1126.) Our Supreme Court has also

---

[6] The *Kolender* opinion illustrates this point. There, the justices identified at least one set of circumstances in which a violation of the challenged statute would undoubtedly occur. A citizen's outright refusal to provide any information or identification to a police officer upon request could not possibly satisfy the statutory requirement for production of "reasonable and credible" proof of one's identity. However, because the level of vagueness within the statutory language contravened the basic requirements of due process, the law inevitably posed a total and fatal conflict with constitutional prohibitions.

entertained facial challenges without any apparent distinction between the two standards. (See e.g., *Matosantos*, *supra*, 53 Cal.4th at p. 278 ["It is unclear which standard the majority employs [in this case]"]; *People v. Heitzman* (1994) 9 Cal.4th 189, 199-200 (*Heitzman*); *Caswell*, *supra*, 46 Cal.3d at pp. 389-401.) In *Caswell*, where appellants challenged only the "facial validity" of a criminal statute, a two-pronged analysis was employed under the void-for-vagueness doctrine without reference to either standard of review. (*Caswell, supra,* at pp. 389-401.) The same occurred in *Heitzman*.

There is inconsistency among the districts of the Court of Appeal as well. In *Sanchez*, *supra*, this court was presented with a facial challenge made on equal protection grounds to the California Voting Rights Act of 2001. (*Sanchez*, *supra,* 145 Cal.App.4th at pp. 665-666, 678.) After discussing the import of *Salerno*, the opinion concludes "there is no warrant for refusing to apply *Salerno* outside the First Amendment overbreadth and abortion areas until a majority of the [United States] Supreme Court gives clear direction to do so." (*Id*. at p. 679.) One could argue this statement was unnecessary, if not incorrect, considering the case did not involve a criminal statute, the void-for-vagueness doctrine, or any issues of constitutional due process. In any event, we subsequently took a different approach to facial invalidation by employing the "in the generality or great majority of cases" standard in *Building Industry Assn. of Central California v. County of Stanislaus* (2010) 190 Cal.App.4th 582. (*Id*. at pp. 590-591, 593 [assessing the facial validity of an agricultural conservation program adopted by Stanislaus County].)

Contrast *Sanchez* with the approach taken by the First District in *County of Sonoma v. Superior Court* (2009) 173 Cal.App.4th 322, which involved a facial challenge to the constitutionality of an earlier version of Code of Civil Procedure section 1299 et seq. (*Id*. at pp. 329, 337.) The appellate court dispensed with the standard of review issue in a few short sentences: "[Real party in interest] insists that we must deny the County's petition unless no set of circumstances exists under which the law will be valid.

26.

We think this is a more stringent test than that applied by the California Supreme Court. *We may not uphold the law simply because in some hypothetical situation it might lead to a permissible result*." (*Id*. at p. 337, italics added, internal citations and quotation marks omitted.)

In summary, controversy over the proper analytical framework for facial challenges is a recurring issue that has evaded resolution. Courts frequently avoid the debate by concluding a given challenge fails under both the strict and more lenient standards of review. (See, e.g., *Browne v. County of Tehama* (2013) 213 Cal.App.4th 704, 717; *Coffman Specialties, Inc. v. Department of Transportation* (2009) 176 Cal.App.4th 1135, 1154.) The present state of the law is thus uncertain. (*Today's Fresh Start, Inc. v. Los Angeles County Office of Educ.* (2013) 57 Cal.4th 197, 218 ["The standard for a facial constitutional challenge to a statute is exacting. It is also the subject of some uncertainty…. [W]e need not settle the precise formulation of the standard because under any of the versions we have articulated the due process claim [made by appellant] would fail."].)

**The Criminal Statutes In Question Are Subject To Heightened Scrutiny In Accordance With *Hoffman Estates*, *Kolender* and *Morales***

Appellants contend the *Salerno* rule has been repeatedly applied in "firearms-related" cases, thus implying our court would be far afield from a consensus view if we used a different standard in this case. The persuasiveness of that argument is dubious, considering the cases cited by appellants were all decided by federal courts of appeals in circuits where *Salerno* has been adopted and/or recognized as binding precedent. (See, e.g., *GeorgiaCarry.Org, Inc. v. Georgia* (11th Cir. 2012) 687 F.3d 1244, 1255, fn. 19 ["While *Salerno* is often criticized, its holding remains binding precedent, which we faithfully apply here."].) Under the doctrine of stare decisis, those courts are obligated to apply the *Salerno* standard to all facial challenges, regardless of the constitutional grounds upon which they are asserted or the underlying subject matter, except for in

27.

cases involving the overbreadth doctrine "in the limited context of the First Amendment." (*Salerno*, *supra,* 481 U.S. at p. 745.)

Furthermore, appellants have not identified any cases in which the California Supreme Court has adopted the *Salerno* rule or otherwise equated its inflexible "no set of circumstances" language with the standard of review for facial challenges. The strictest standard has consistently been described as requiring that a statute's provisions "inevitably pose a present total and fatal conflict with applicable constitutional prohibitions." (*Ann S.*, *supra*, 45 Cal.4th at p. 1126, quoting *Pacific Legal Foundation v. Brown* (1981) 29 Cal.3d 168, 180-181.) Appellants rely on *People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090 (*Acuna*), where the California Supreme Court cited and quoted *Hoffman Estates* as standing for the principle that an unconstitutionally vague law is one that is "impermissibly vague in all of its applications." (*Acuna*, 14 Cal.4th at p. 1116, italics omitted.) However, as explained above, the *Hoffman Estates* standard is a qualified rule which "assum[es] the enactment implicates no constitutionally protected conduct," and recognizes the need for heightened scrutiny of criminal statutes. (*Hoffman Estates*, *supra,* 455 U.S. at pp. 494-495, 498-499.)

If California's strictest standard of review mirrors the *Hoffman Estates* standard, it is flexible and yielding to vagueness concerns under the due process clause of the United States and California Constitutions when three elements are present. First, the statute at issue must reach or implicate a substantial amount of constitutionally protected conduct. (*Hoffman Estates*, *supra,* 455 U.S. at pp. 494-495; *Kolender*, *supra,* 461 U.S. at p. 358 and fn. 8; *Morales*, *supra,* 527 U.S. at p. 53.) Second, the statute must impose criminal rather than civil penalties. (*Hoffman Estates* at pp. 498-499; *Kolender* at p. 358 and fn. 8; *Morales* at p. 55.) Third, the statute must lack a scienter requirement. (*Hoffman Estates* at p. 499; *Morales* at p. 55.)

The "handgun ammunition" statutes under review in this case impose criminal sanctions. (§ 30312, subd. (c); § 30365 ["A violation of Section 30352, 30355, 30360, or

28.

30362 is a misdemeanor."].) The penalties for violating these laws go well beyond the "stigmatizing effect" described in *Hoffman Estates*. There, "head shop" owners were at risk of being labeled "sellers of drug paraphernalia" and being assessed monetary fines "not less than $10 and not more than $500." (*Hoffman Estates*, *supra,* 455 U.S. at pp. 492, 499, fn. 16.) Here, both ordinary citizens and ammunition vendors face the risk of being branded a criminal, and the attendant consequences of a criminal conviction. Furthermore, the statutes do not contain a scienter requirement. (See §§ 30312, 30352, 30355, 30360, and 30362.)

With two of the three elements satisfied, the remaining question is whether these laws involve a substantial amount of constitutionally protected conduct. The void-for-vagueness doctrine is not dependent upon the existence of an actual violation of constitutional rights apart from the due process protections of the Fifth and Fourteenth Amendments. Under *Hoffman Estates*, *Kolender*, and *Morales*, the inquiry is whether an allegedly vague statute "implicates" or "reaches" a substantial amount of constitutionally protected activity, or "threatens to inhibit the exercise of constitutionally protected rights." (*Hoffman Estates*, *supra,* 455 U.S. at pp. 494-495, 499; *Kolender*, *supra,* 461 U.S. at p. 358 and fn. 8; *Morales*, *supra,* 527 U.S. at p. 55.)

Two decisions by the United States Supreme Court support the conclusion that the statutes in this case implicate (i.e., involve as a consequence, corollary or natural inference) individual rights under the Second Amendment. (See Merriam-Webster's Collegiate Dict. (11th ed. 2011) p. 624.) In *District of Columbia v. Heller* (2008) 554 U.S. 570, the United States Supreme Court held that the Second Amendment guarantees an individual right to possess and use firearms for traditionally lawful purposes, including self-defense within the home. (*Id.* at pp. 626-635.) The Supreme Court also recognized that handguns are "the most preferred firearm in the nation to keep and use for protection of one's home and family." (*Id*. at pp. 628-629, citation & internal quotation marks omitted.)

29.

In *McDonald v. Chicago* (2010) 561 U.S. ___, [130 S.Ct. 3020] (*McDonald*), it was held that Second Amendment rights are fully applicable to the States. (*McDonald*, 130 S.Ct. at p. 3026.) At least one federal court has reasoned that the right to possess and use a firearm in one's home for self-defense necessarily includes the right to acquire ammunition for the weapon. (See *Bateman v. Perdue* (E.D.N.C. 2012) 881 F.Supp.2d 709, 714.) This is quite logical, since the utility of a gun for self-defense purposes is greatly reduced without ammunition.

Apart from Second Amendment concerns vis-à-vis the buyers of ammunition, one must consider the rights of the "handgun ammunition vendors" who face criminal liability under the statutory scheme. The liberty interest at stake for this group is the right to pursue lawful and remunerative business endeavors. "The right to engage in a legitimate employment or business receives recognition as a portion of the individual freedoms secured by the due process provision of the federal and state Constitutions." (*Doyle v. Board of Barber Examiners* (1963) 219 Cal.App.2d 504, 509, citing *Schware v. Board of Bar Examiners* (1957) 353 U.S. 232, 238-239; *Truax v. Raich* (1915) 239 U.S. 33, 41; *Bautista v. Jones* (1944) 25 Cal.2d 746, 749.) The implication of this right is particularly notable with respect to those vendors whose business model involves mail-order or Internet sales of firearm ammunition.

As discussed above, section 30352 requires a face-to-face transaction for the sale of "handgun ammunition." (§ 30352, subd. (a).) As part of the transaction, the vendor must obtain an extensive amount of information and identifying characteristics from the buyer. Among those identifying characteristics are the buyer's signature and right thumbprint. (§ 30352, subd. (a)(4) & (6).)

A traditional brick-and-mortar business can err on the side of caution by complying with the provisions of section 30352 and related statutes in every transaction involving the sale of firearm ammunition. This type of safeguard is unavailable to mail-order businesses and online retailers who cannot lawfully sell "handgun ammunition"

without face-to-face interaction. In the absence of a sufficiently clear definition of that term, these vendors must repeatedly choose between foregoing what may or may not be a lawful sales transaction, or making a sale at the risk of criminal liability and punishment.

One of the dangers of allowing vague laws to remain in effect is that "[u]ncertain meanings inevitably lead citizens to steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked." (*Grayned*, *supra*, 408 U.S. at pp. 108-109, fn. and quotation marks omitted.) Respondents connect this principle to the evidence in the record and persuasively argue that the impact on mail-order and Internet vendors would translate to a reduction in the availability of ammunition, which in turn threatens to drive up prices and make it more difficult for individuals in rural or remote areas to purchase cartridges for their firearms.

When one considers the interplay between the rights of ammunition buyers and vendors, it is difficult to argue that the challenged statues do not reach a substantial amount of constitutionally protected conduct. (See *Hoffman Estates*, *supra,* 455 U.S. at pp. 494-495.) The vendors' Fourteenth Amendment right to engage in legitimate business activity cannot be characterized as a purely economic interest because the statutes at issue are criminal laws with criminal penalties. Although individual rights under both the Second and Fourteenth Amendments are subject to reasonable restrictions and regulation, the fact remains that these statutes implicate a significant amount of constitutionally protected behavior. As such, the third element necessary for the void-for-vagueness exception under the *Hoffman Estates* standard is satisfied.

In the alternative, if we accept appellants' argument that California's strictest standard is the same as the *Salerno* rule, and also accept appellants' interpretation of that standard, we must still decide whether it is appropriate in this particular case. Our Supreme Court has acknowledged that the question of when and under what circumstances one standard should be chosen over the other is unresolved. Therefore, we must be mindful of the circumstances that have warranted a more lenient standard of

31.

review in similar cases and of important policy considerations that compete with those holding facial attacks in disfavor.

The facial challenge in this case does not rest on a "factually barebones record," nor does it require us to "anticipate a question of constitutional law in advance of the necessity of deciding it." (See *Washington State Grange v. Washington State Republican Party*, *supra*, 552 U.S. at pp. 450-451, internal quotation marks omitted [discussing why facial challenges are disfavored].) As we explain below, respondents have identified an inherent due process violation within the text of a criminal statute. "'No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes.'" (*Morales*, *supra*, 527 U.S. at p. 58.) If the inflexible *Salerno* standard is used, the due process rights of countless citizens will be violated when they are forced to guess at the meaning of the term "handgun ammunition." There would be little justification for this result outside of our ability to conceive of a scenario in which application of the law to one particular cartridge would not be vague.

Respondents have also highlighted the risk of arbitrary and discriminatory application of the statutes by law enforcement. The level of discretion conferred upon individual officers to decide what does or does not constitute "handgun ammunition" on a case-by-case basis conflicts with basic due process principles. Delaying resolution of this problem until it returns to this court or reaches other districts through a series of "as applied" challenges does not promote efficiency or judicial economy. The delay is unnecessary, especially when legislative enactments "may be declared invalid in their entirety if piecemeal adjudication of the legality of the statute would entail the vague or uncertain future application of the statute, thereby inhibiting the exercise of constitutional rights." (*Siller*, *supra*, 187 Cal.App.3d at p. 49.)

The policy considerations underlying the void-for-vagueness doctrine weigh in favor of applying heighted scrutiny to the challenged statutes in accordance with the principles articulated in *Hoffman Estates*, *Kolender*, *Morales*, and analogous California

case law.  To the extent such heightened scrutiny cannot be reconciled with the standard requiring a "total and fatal conflict with applicable constitutional prohibitions," we find California's more lenient standard of review for facial challenges is appropriate here.  This standard permits facial invalidation of a statute if the law conflicts with constitutional protections in the generality or great majority of cases.

**The Challenged Statutes Are Unconstitutionally Vague**

"All presumptions and intendments favor the validity of a statute and mere doubt does not afford sufficient reason for a judicial declaration of invalidity." (*Personal Watercraft Coalition v. Board of Supervisors* (2002) 100 Cal.App.4th 129, 137 (*Personal Watercraft Coalition*), quoting *Lockheed Aircraft Corp. v. Superior Court* (1946) 28 Cal.2d 481, 484.)  The presumption of validity prevails if there is a reasonable degree of certainty in the text of the challenged provisions. (*Heitzman*, *supra*, 9 Cal.4th at p. 199.)  A criminal statute is reasonably certain if its language is "definite enough to provide (1) a standard of conduct for those whose activities are proscribed and (2) a standard for police enforcement and for ascertainment of guilt." (*Williams v. Garcetti* (1993) 5 Cal.4th 561, 567, citations and internal quotation marks omitted.)  This is the two-pronged test of the void-for-vagueness doctrine.  (See *Caswell*, *supra*, 46 Cal.3d at pp. 389-390.)

While the second prong generally focuses on the existence of minimal guidelines to govern police officers, a corollary rule is that statutes "must provide a standard or guide against which conduct can be uniformly judged by courts…." (*Morrison v. State Board of Education* (1969) 1 Cal.3d 214, 231.)  Ambiguous terms can be made reasonably certain by reference to "definable sources" such as other code provisions. (*Burg v. Municipal Court* (1983) 35 Cal.3d 257, 272; *Personal Watercraft Coalition*, *supra*, 100 Cal.App.4th at p. 139.)  A reviewing court also examines the relevant legislative history and any California decisions construing the challenged statutory language.  (*Heitzman*, *supra*, 9 Cal.4th at p. 200.)

Here we focus on the language that defines the term "handgun ammunition." (§ 16650, subd. (a) ["'handgun ammunition' means ammunition principally for use in pistols, revolvers, and other firearms capable of being concealed upon the person, notwithstanding that the ammunition may also be used in some rifles."]) The parties agree the word "principally" should be understood to mean "primarily" or more than 50 percent of the time. Respondents, however, raise a host of questions regarding the variables that shape the concept of ammunition "principally for use" in handguns.

Is the standard determined by the behavior of all users of firearms or only certain groups such as civilian gun owners in a geographic region, e.g., nationally, in California, or by county, city, or otherwise? Is ammunition usage by military and law enforcement personnel included in the equation? Are changes in the availability or popularity of certain firearms and cartridges taken into consideration? Is the definition based on sales statistics, crime statistics, or other data gathered over a certain period of time? In the absence of baseline standards, the classification of interchangeable calibers and cartridges as "handgun ammunition" may be a fluid concept or a moving target, so to speak.

The substantive text of section 16650 comes from former section 12323, subdivision (a), which dates back to the 1982 enactment of laws criminalizing the possession and sale of armor piercing ammunition. (Stats. 1982, ch. 950, § 3; Stats. 1995, ch. 263, § 3; See Stats. 2009, ch. 628, § 2.) Prior to the passage of Assembly Bill No. 962 (2009-2010 Reg. Sess.), the definition of "handgun ammunition" was relevant only to the restrictions against ammunition designed to penetrate metal or armor as set forth in former sections 12320 and 12321.[7] Like the trial court, we have searched for

---

[7] Former sections 12320 and 12321 are now found at sections 30315 and 30320, respectively. Former section 12323, subdivision (b), which defined "Handgun ammunition designed primarily to penetrate metal or armor," is now set forth in section 16660. These statutes were not challenged by respondents and we express no opinion as to their constitutional validity.

case law interpreting or construing the challenged definition, including cases involving former section 12323, but found none. The legislative history offers no further insight into the issue before us.

Appellants claim it is "no secret that certain ammunition cartridges are more often used in handguns than in rifles." Whether or not this is true, determining *which* cartridges are used seems rather arcane. In his attempt to compile a list of "handgun ammunition," appellants' expert, Blake Graham, reviewed treatises, Internet sources, and five years' worth of sales records from non-public databases at the Department of Justice to determine the most commonly purchased and transferred calibers of handguns in California. He then applied his "experience and expertise" to this data, which led him to determine that 16 cartridges satisfied the definition used in the challenged statutes. Setting aside respondents' criticisms of his methodology,[8] we note Mr. Graham's purported ability to understand the meaning of the law depended upon highly specialized knowledge and training, extensive research, and his own subjective interpretations.

In his sworn declaration, Mr. Graham explains that he was careful to prevent "dual use issues" from clouding his analysis, meaning he eschewed calibers and cartridges that "might be used just as often in handguns as rifles." For example, he conceded it would not be possible to determine whether .22-caliber ammunition is principally used in handguns or in rifles, at least without further research, and that "[t]he same is true of certain other calibers."

We see the "dual use issues" as the heart of the problem. Given there are over a thousand different cartridges, and accepting the undisputed premise that almost all of them can be used interchangeably with handguns and rifles, Mr. Graham's statements underscore the uncertainty of the statutory language. Even if we accept that there are a

---

[8] Among other things, Respondents take issue with the fact that Mr. Graham did not compare handgun sales with rifle sales.

35.

handful of circumstances where the term "handgun ammunition" is not vague to a trained expert, there are countless scenarios in which average citizens and even those with superior knowledge "must necessarily guess at its meaning and differ as to its application." (*Connally, supra*, 269 U.S. at p. 391.) Contrary to appellant's arguments, inherent vagueness in a criminal statute cannot be cured by listing a few examples that can be interpreted as violations of a standardless law. This brings us back to the principle recited in *Morales*: "The Constitution does not permit a legislature to 'set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully [prosecuted].'" (*Morales*, *supra,* 527 U.S. at p. 60, quoting *United States v. Reese* (1876) 92 U.S. 214, 221.)

Appellants argue that because the statutory scheme applies to members of a particular vocation, namely ammunition vendors, we should assume those individuals share a common understanding of the term "handgun ammunition." This is especially true, appellants contend, because some vendors advertise their inventory as "handgun ammunition" and "rifle ammunition." We are not persuaded by this reasoning.

"Where the requisite certainty is not apparent on the face of the statute the deficiency may be satisfied by 'common understanding and practices' [Citations] 'or from any demonstrably established technical or common law meaning of the language in question.'" (*People v. Barksdale* (1972) 8 Cal.3d 320, 327.) Even if the marketing techniques cited by appellants reflect a widespread practice in the industry, which is not confirmed by their evidence, this does not establish a technical meaning or universally accepted standard among vendors. Furthermore, designations by individual retailers may very well conflict with the interpretations of law enforcement officers. Appellants' argument also avoids the fact that section 30312 (former § 12318), which regulates the delivery or transfer of ownership of "handgun ammunition," applies to all citizens and not just "handgun ammunition vendors."

A criminal statute fails to meet the requirements of due process "if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits." (*Morales*, *supra*, 527 U.S. at p. 56, quoting *Giaccio v. Pennsylvania* (1966) 382 U.S. 399, 402-403; accord, *Kolender*, *supra*, 461 U.S. at p. 357.) Several firearms users and vendors with different backgrounds were deposed in this case, including two highly credentialed experts, yet none shared the same understanding of what is meant by the notion of ammunition "principally for use" in handguns. This is not surprising considering the statutes provide no guidance or objective criteria for that concept. Mathematical precision is not required, but an average person of ordinary intelligence must be able to identify the applicable "standard for inclusion and exclusion." (*Smith v. Goguen* (1974) 415 U.S. 566, 578.) In this case the standard is elusive at best.

We find no basis from the text of the challenged statutes, their legislative history, the record on appeal, or elsewhere upon which to conclude there is a common understanding or objective meaning of the term "handgun ammunition." The level of certainty necessary to provide fair notice of the proscribed conduct and adequate standards for compliance with the law is missing. Therefore, the statutory scheme is unconstitutional.

Because the challenged provisions fail to provide meaningful guidelines or discernable standards, there is a significant risk of arbitrary and discriminatory application by law enforcement officials. The lack of statutory guidance effectively confers discretion upon individual police officers to interpret the law themselves, thus allowing it to be enforced selectively or haphazardly. As such, the statutes do not satisfy the due process requirements under the second prong of the void-for-vagueness doctrine.

The foregoing analysis leads us to conclude that vagueness permeates the text of section 16650 (former §§ 12060, subd. (b); 12323, subd. (a)), section 30312 (former § 12318), and sections 30345 through 30365 (former § 12061) to the point where constitutional guarantees of due process are violated. We believe the inherent vagueness

37.

of the statutory scheme presents a total and fatal conflict with the due process clauses of the United States and California Constitutions, even if one could conceive of a scenario in which application of the law to a particular set of facts would not involve ambiguity. At a minimum, the challenged statutes present a general conflict with the protections of due process and are unconstitutionally vague in the great majority of cases for failure to provide adequate notice of the conduct proscribed and a reasonably certain standard for enforcement of the law.  Therefore, the statutes are void for vagueness.

## II.

## THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN THE PARTIAL DENIAL OF APPELLANTS' MOTION TO TAX COSTS

### Background

This part of the appeal involves a dispute over a $40 filing fee.  In September 2010, respondents filed a motion for preliminary injunction seeking to enjoin enforcement of the challenged statutes pending a final adjudication on the merits. Respondents withdrew the motion in November 2010.

In March 2011, after succeeding on their motion for summary adjudication, respondents filed a memorandum of costs pursuant to Code of Civil Procedure section 1032.  Respondents claimed costs totaling $11,355.63, including the filing fee for their withdrawn motion for preliminary injunction.  Appellants subsequently filed a motion to tax costs.  In pertinent part, appellants' motion argued that "[t]he State should not be made to bear the cost of filing a preliminary injunction motion that was withdrawn before it was decided – by definition such a cost is not reasonably necessary to the litigation because [as a result of the withdrawal] it is as if the motion 'had not been made.'  The State therefore requests that the Court tax the $40.00 motion filing fee."

Appellants' motion to tax costs was partially granted in the amount of $2,572.18, but denied as to the filing fee for the preliminary injunction motion.  The following grounds were stated in the trial court's decision: "Filing and motion fees are allowable

38.

costs. (Code of Civil Procedure § 1033.5(a)(1).) Defendants have not met their initial burden of proof of demonstrating that the motion fee for the Plaintiffs' motion for preliminary injunction was unnecessary or unreasonable. (*Ladas v. Cal. State Auto. Ass'n* (1993) 19 Cal.App.4th 761, 774.)"

Appellants now appeal the trial court's decision to not tax the $40 filing fee. In doing so, they ask us to decide whether there should be a per se rule against the recovery of costs for a withdrawn motion. The issue is characterized in appellants' briefs as an important matter of first impression.

## Discussion

Section 1032 of the Code of Civil Procedure provides for the recovery of costs by a prevailing party. "Prevailing party" is defined as including: "[1] the party with a net monetary recovery, [2] a defendant in whose favor a dismissal is entered, [3] a defendant where neither plaintiff nor defendant obtains any relief, and [4] a defendant as against those plaintiffs who do not recover any relief against that defendant." (Code Civ. Proc., § 1032, subd. (a)(4).) If a party recovers anything other than monetary relief, or in situations not specified above, the trial court designates a prevailing party and uses its discretion to determine the amount and allocation of costs, if any. (*Ibid*.; *Goodman v. Lozano* (2010) 47 Cal.4th 1327, 1333.)

An order granting or denying a motion to tax costs is reviewed under the abuse of discretion standard. (*Chaaban v. Wet Seal, Inc*. (2012) 203 Cal.App.4th 49, 52.) "To the extent the statute grants the court discretion in allowing or denying costs or in determining amounts, we reverse only if there has been a '"clear abuse of discretion" and a "miscarriage of justice."'" (*Ibid*.)

Appellants do not dispute that respondents were the prevailing party in the matter below. If the items in a prevailing party's cost memorandum appear to be proper charges, the verified memorandum is prima facie evidence the expenses were necessarily incurred. (*Jones v. Dumrichob* (1998) 63 Cal.App.4th 1258, 1266.) In filing a motion to

39.

tax such costs, the moving party has the burden to present evidence showing the expenses were not reasonable or necessary. (*Ibid;* Code Civ. Proc. § 1033.5, subd. (c)(2) ["Allowable costs shall be reasonably necessary to the conduct of the litigation rather than merely convenient or beneficial to its preparation."].)

The trial court was correct that filing fees are allowable as costs under Code of Civil Procedure section 1032. (Code Civ. Proc., § 1033.5, subd. (a)(1).) Therefore, respondents' memorandum of costs was prima facie evidence that their filing fees were necessarily incurred. Appellants had the burden to prove otherwise. Instead, they argued fees for a withdrawn motion should not be allowed as a matter of law.

Appellants' position is based on language from an opinion by the Supreme Court of Wyoming, *Hammons v. Table Mountain Ranches Owners Ass'n, Inc.* (Wyo. 2003) 72 P.3d 1153 (*Hammons*). The opinion states, "[a] motion withdrawn leaves the record as it stood prior to the filing of the motion, i.e., as though it had not been made." (*Id.* at p. 1157.) We do not take issue with this proposition, but it is completely irrelevant to this appeal.

The *Hammons* case did not involve the recovery of litigation costs. Moreover, the word "record," as used in the context of the quoted language from *Hammons*, merely refers to the documents on file with the trial court and issues raised within those documents. (See *Hammons, supra,* 72 P.3d at pp. 1156-1157.) Returning the "record" to the state it was in before the particular motion was made does not magically eliminate any tangible or intangible benefits a litigant may have derived from preparing and filing the motion.

A withdrawn motion is analogous to an unsuccessful motion, especially in this case since the trial court apparently gave respondents the choice to either withdraw their motion for preliminary injunction or have it denied. There is precedent for the recovery of fees for an unsuccessful motion. Conferring discretion upon trial courts to allow such recovery rests upon sound policy considerations. "Litigation often involves a succession

40.

of attacks upon an opponent's case; indeed, the final ground of resolution may only become clear after a series of unsuccessful attacks.  Compensation is ordinarily warranted even for unsuccessful forays." (*City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1303 [permitting the recovery of attorney fees associated with a withdrawn motion pursuant to Code Civ. Proc. § 1021.5].)  "A litigant should not be penalized for failure to find the winning line at the outset, unless the unsuccessful forays address discrete unrelated claims, are pursued in bad faith, or are pursued incompetently, i.e, are such that a reasonably competent lawyer would not have pursued them." (*Ibid*.)

We find these policy considerations militate against a per se rule that prohibits the recovery of fees for withdrawn motions in all cases.  The trial court's ability to allow or disallow such fees at its discretion is an adequate safeguard against the unfair shifting of litigation costs from one party to another.  Notwithstanding the lack of merit in appellants' legal arguments, the trial court could have easily concluded that the work respondents put into their preliminary injunction motion was significant to the development and preparation of their motion for summary adjudication.  We find no abuse of discretion in the trial court's ruling on the motion to tax costs.

## **<u>DISPOSITION</u>**

The judgment is affirmed.  Respondents are entitled to their costs on appeal.


_____

Gomes, J.

I CONCUR:


_____

Kane, J.

41.

**CORNELL, J., Dissenting**

We are reviewing a facial attack on admittedly vague statutes that have yet to be enforced. Does that vagueness make the statutes unconstitutional? My colleagues think that it does. I do not.

The majority opinion, in my view, does not accord due deference to the Legislature in its attempt to address a serious public safety concern. Nor does it heed the jurisprudential canon that before declaring a statute void for vagueness, the trial court must determine whether its validity can be preserved by giving "'specific content' to terms that might otherwise be unconstitutionally vague. [Citations.]" (*People v. Heitzman* (1994) 9 Cal.4th 189, 209.)

Rather than invalidate these statutes that have yet to be enforced, I would apply the stricter standard to assess respondents' facial challenge. I also would construe the statutes to include a scienter element and limit their application to those cartridges that generally are recognized as "principally for use" in handguns. Under this commonsense construction, I would conclude the statutes convey a sufficiently definite warning of the regulated conduct and uphold their constitutionality.

**Additional Facts**

In signing Assembly Bill No. 962 (2009-2010 Reg. Sess.) (Assembly Bill No. 962) into law, former Governor Schwarzenegger wrote:

> "This measure would require vendors of handgun ammunition to keep a log of information on handgun ammunition sales, store ammunition in a safe and secure manner, and require the face-to-face transfer of ammunition sales.

> "Although I have previously vetoed legislation similar to this measure, local governments have demonstrated that requiring ammunition vendors to keep records on ammunition sales improves public safety. These records have allowed law enforcement to arrest and prosecute persons who have no business possessing firearms and ammunition: gang members, violent parolees, second and third strikers, and even people previously serving time in state prison for murder.

Utilized properly, this type of information is invaluable for keeping communities safe and preventing dangerous felons from committing crimes with firearms.

"Moreover, this type of recordkeeping is no more intrusive for law abiding citizens than similar laws governing pawnshops or the sale of cold medicine. Unfortunately, even the most successful local program is flawed; without a statewide law, felons can easily skirt the recordkeeping requirements of one city by visiting another. Assembly Bill [No.] 962 will fix this problem by mandating that all ammunition vendors in the state keep records on ammunition sales.

"As Governor, I have sought the appropriate balance between public safety and the right to keep and bear arms…. Assembly Bill [No.] 962 reasonably regulates access to ammunition and improves public safety without placing undue burdens on consumers." (Historical and Statutory Notes, 51D pt. 1 West's Ann. Pen. Code (2012 ed.) foll. § 12060, pp. 262-263.)

The former Governor's signing message acknowledged that several local governments had enacted ordinances requiring ammunition vendors to keep records of ammunition sales, which have lead to improved public safety. These local ordinances require a sales log for *all* firearm ammunition sales. (See, e.g., Sacramento City Code, section 5.66.020 [ammunition sales log required]; Los Angeles Municipal Code section 55.11 [requirement for ammunition sales]; San Francisco Police Code section 615 [records of ammunition sales].) The California Legislature did not disclose why, in enacting the challenged provisions, it chose to focus on handgun ammunition sales. However, recent statements from the United States Supreme Court may provide a reason.

In *District of Columbia v. Heller* (2008) 554 U.S. 570 (*Heller*), handguns were singled out as a particular public safety problem. In the final paragraph of the majority opinion, the court stated, "We are aware of the problem of handgun violence in this country, and we take seriously the concerns raised by the many *amici* who believe that prohibition of handgun ownership is a solution. The Constitution leaves the District of Columbia a variety of tools for combating that problem, including some measures regulating handguns [such as laws imposing conditions and qualifications on the commercial sale of arms]." (*Id.* at pp. 627, 636.)

2.

Additionally, a dissenting opinion stated:

> "Handguns are involved in a majority of firearm deaths and injuries in the United States. [Citation.] From 1993 to 1997, 81% of firearm-homicide victims were killed by handgun. [Citations.] In the same period, for the 41% of firearm injuries for which the weapon type is known, 82% of them were from handguns. [Citation.] And among children under the age of 20, handguns account for approximately 70% of all unintentional firearm-related injuries and deaths. [Citation.] In particular, 70% of all firearm-related teenage suicides in 1996 involved a handgun. [Citations.]

> "Handguns also appear to be a very popular weapon among criminals. In a 1997 survey of inmates who were armed during the crime for which they were incarcerated, 83.2% of state inmates and 86.7% of federal inmates said that they were armed with a handgun. [Citation]; see also Weapon Use and Violent Crime 2 (Table 2) (statistics indicating that handguns were used in over 84% of nonlethal violent crimes involving firearms from 1993 to 2001). And handguns are not only popular tools for crime, but popular objects of it as well: the Federal Bureau of Investigation received on average over 274,000 reports of stolen guns for each year between 1985 and 1994, and almost 60% of stolen guns are handguns. [Citation.] Department of Justice studies have concluded that stolen handguns in particular are an important source of weapons for both adult and juvenile offenders. [Citation.]" (*Heller*, *supra*, 554 U.S. at pp. 697-698 (dis. opn. of Breyer, J.).)

## Question Presented

The constitutional question presented here is whether the statutory language "principally for use" in handguns is sufficiently certain under the void for vagueness doctrine to satisfy the due process clause of the Fourteenth Amendment. I conclude the answer to that question is affected substantially by the procedural posture of respondents' constitutional challenge. Respondents have brought a preenforcement facial vagueness challenge to the handgun ammunition provisions. A preenforcement facial vagueness challenge is a claim that the law is "invalid in toto—and therefore incapable of any valid application. [Citation.]" (*Hoffman Estates v. Flipside, Hoffman Estates* (1982) 455 U.S. 489, 494, fn. 5 (Hoffman Estates); see *Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1109 (*Tobe*).) Because this is a preenforcement challenge, albeit to a criminal statute, I

3.

would require respondents to establish that the challenged provisions are unconstitutionally vague in all applications in order to prevail.

**Void for Vagueness Doctrine**

A criminal statute must define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. (*Skilling v. United States* (2010) ___ U.S. ___ [130 S.Ct. 2896, 2927-2928]; *People v. Morgan* (2007) 42 Cal.4th 593, 605 (*Morgan*).) The degree of vagueness the Constitution tolerates, as well as the relative importance of fair notice and fair enforcement, depends on two factors. The first and more important factor is whether the statute threatens to inhibit the exercise of constitutionally protected rights, particularly First Amendment rights. (*Hoffman Estates, supra,* 455 U.S. at p. 499.) The second is the nature of the statute. An economic regulation or a statute imposing civil penalties is subject to a less strict vagueness test than a statute imposing criminal penalties. And, a scienter requirement can mitigate a criminal law's vagueness, especially as to the adequacy of notice to the individual regarding the conduct proscribed. (*Id.* at pp. 498-499.)

**Standard of Review for Facial Challenges**

I disagree with the majority regarding the standard this court should apply to review respondents' facial vagueness challenge. Both the United States Supreme Court (*United States v. Salerno* (1987) 481 U.S. 739) and the California courts have articulated two tests for resolving facial challenges. Under the *Salerno* standard's strict "void in all applications" test, the statute will be upheld unless the challenging party establishes its provisions are impermissibly vague in all applications and pose a present total and fatal conflict with applicable constitutional principles. (*Id.* at p. 745; *Morgan, supra*, 42 Cal.4th at pp. 605-606 ["'a party … must demonstrate that "the law is impermissibly vague *in all of its applications*"'"].) Under the more lenient test, a party must establish

4.

that the statute is impermissibly vague "'in the generality or great majority of cases.' [Citations.]" (*Guardianship of Ann S.* (2009) 45 Cal.4th 1110, 1126-1127.)

Which standard applies under what circumstances is unresolved in both the federal and California courts. Many courts have avoided determining which standard is applied to the facial challenge before them by concluding that the challenge fails under both standards. (See, e.g., *Washington v. Glucksberg* (1997) 521 U.S. 702, 739-740 (conc. opn. of Stevens, J.); *Today's Fresh Start, Inc. v. Los Angeles County Office of Education* (2013) 57 Cal.4th 197, 218.)! We do not have that option. Most of the respondents who oppose enforcement of the challenged provisions concede the statutes have some valid applications. Thus, if the court applies the void in all applications test, their challenge fails. If the court applies the void in the generality of cases test, they may prevail.

The majority applies the more lenient "vague in the generality of cases" test because it concludes the statutes implicate a substantial amount of constitutionally protected conduct, impose criminal penalties, and lack a scienter element. While I agree the statutes impose misdemeanor criminal liability, I nevertheless would apply the stricter "void in all applications" test for three reasons.

First, respondents have brought a preenforcement facial vagueness challenge to the statutes rather than a facial challenge after enforcement. Second, although the provisions may minimally burden handgun ammunition purchases, they do not reach a substantial amount of constitutionally protected conduct. And third, the California Supreme Court has applied the stricter test in resolving facial vagueness challenges to criminal statutes.

### 1. Preenforcement Facial Challenge

The majority acknowledges that facial challenges to legislation are disfavored but ignore the preenforcement aspect of respondents' facial challenge. While *Hoffman Estates* involved a preenforcement—but threatened—challenge, the remaining Supreme

5.

Court cases the majority cites involved facial challenges to statutes that had been enforced, sometimes numerous times. In *Kolender v. Lawson* (1983) 461 U.S. 352, 354-355, the defendant had been arrested 15 times under the challenged statute; in *City of Chi. v. Morales* (1999) 527 U.S. 41, 49, the gang loitering ordinance had resulted in over 42,000 arrests. (Accord, *Lanzetta v. New Jersey* (1939) 306 U.S. 451; *Connally v. General Const. Co.* (1926) 269 U.S. 385 [threatened enforcement].) The record before the court in those cases provided ample evidence of how the challenged statutes were enforced and substantially supported the challenger's assertions of arbitrary enforcement, the lynchpin of the court's void for vagueness findings in *Kolender* and *Morales*.

Here, in contrast, the statutory challenge was brought hastily so the trial court could rule before the operative date of the new legislation. Further, the challenge is composed largely of declarations and deposition testimony from parties opposed to any sort of gun control, who speculate, as they must, regarding how the provisions will be enforced. Because the statutes have yet to be enforced, I would require respondents to establish that the statutes have no constitutional application to prevail on their preenforcement challenge.

### 2. *Threat to Constitutionally Protected Rights and Nature of the Provisions*

I disagree with the majority's conclusion that the challenged statutory provisions implicate a substantial amount of constitutionally protected conduct: the individual rights of ammunition buyers under the Second Amendment and the liberty interest of handgun ammunition vendors to pursue lawful business endeavors.

*Heller, supra,* 554 U.S. 570 confirmed that the Second Amendment protects an individual's right to possess functional firearms for self-defense and recognized that handguns are the most popular weapon chosen by Americans for self-defense in the home. (*Heller,* at pp. 629, 635.) Further, the right to bear arms necessarily includes the right to acquire ammunition essential to a functional firearm. (See, e.g., *Bateman v.*

6.

*Perdue* (E.D.N.C. 2012) 881 F.Supp.2d 709, 714.)  In my view, however, the challenged provisions fall within the reasonable conditions on the commercial sale of arms recognized in *Heller* and *McDonald v. City of Chicago Ill.* (2010) ___U.S.___ [130 S.Ct. 3020, 3026 [incorporation of the Second Amendment into the Fourteenth Amendment did not endanger every law regulating firearms].)

The provisions requiring the ammunition seller or transferor to record the buyer's identification information at a sale of ammunition principally for use in a handgun does not unduly burden the buyer's Second Amendment right to possess an operable handgun for self-defense in the home.  The resulting minor inconvenience to the buyer is quite distinct from any threat to inhibit his or her right to possess an operable handgun for self-defense.  The same is true of the requirement of face-to-face transfers of handgun ammunition.  A decrease in convenience does not constitute a meaningful deprivation of the right.

I also do not agree that the challenged provisions threaten to inhibit the handgun ammunition vendors' liberty rights to pursue a lawful business.  The majority singles out vendors whose business model involves mail order or Internet sales of ammunition, who under Penal Code section 30312[1] are unable to transfer handgun ammunition without a face-to-face transaction.  The majority concludes such vendors will be forced to choose between foregoing what may or may not be a lawful transaction or making a transfer and risking criminal liability and punishment.  This is a questionable conclusion.  Given the ongoing advances in Internet interactions and transactions, no one can predict accurately how the statutes will affect those vendors or how businesses may adapt to meet the statutory requirements.  Further, I question whether the challenged provisions reach a substantial amount of constitutionally protected behavior.  Respondents cite no law

---

[1]All further statutory references are to the Penal Code unless otherwise stated.

7.

supporting their implied assertion that an out-of-state vendor has a constitutionally protected liberty interest in selling its products by mail order or Internet in California free from the regulations that California has chosen to adopt to address serious public safety concerns within its borders.

Because the challenged statutes impose a minimal burden on the individual's Second Amendment rights and do not have a sufficiently substantial impact on the ammunition vendors' pursuit of lawful business, they do not justify application of the more lenient test to this preenforcement facial vagueness challenge.

Another factor in determining which vagueness test applies is the nature of the challenged provisions. The provisions at issue regulate the sale, display, and transfer of ammunition principally for use in handguns. In some ways, the challenged provisions are akin to the economic regulations at issue in *Hoffman Estates* because they regulate the conduct of the ammunition supplier rather than the user. Courts have applied a less strict vagueness test to economic regulations, reasoning that businesses that face economic regulations can be expected to consult relevant legislation in advance of action. (*Hoffman Estates*, *supra*, 455 U.S. at p. 498.) That is what occurred here. Some of the respondents, who are engaged in the business of selling ammunition, consulted with counsel for assistance in interpreting the provisions before their effective date. Thus, this factor also supports the use of the void in all applications test.

On the other hand, the challenged provisions impose misdemeanor criminal penalties on the suppliers of handgun ammunition who fail to comply with the recordkeeping requirements and on persons who transfer handgun ammunition except in a face-to-face transaction. More leeway, however, is permitted in regulatory statutes, even where criminal penalties are involved. (*People v. Prevost* (1998) 60 Cal.App.4th 1382, 1394.)

Rather than using the criminal liability factor to justify application of the more lenient test to assess facial validity, I would construe the statutes to include a scienter element and give the provisions a practical construction that narrows their application to ammunition generally recognized as principally for use in handguns.**2** I would then apply the stricter "void in all applications" test to this narrowed construction.

### 3. *California Case Authority*

Finally, I would apply the stricter "void in all applications" test utilized by the California Supreme Court when resolving facial vagueness challenges to criminal statutes. For example, in rejecting a facial vagueness challenge to the asportation element of kidnapping, the court stated, "'a party … must demonstrate that "the law is impermissibly vague *in all of its applications*."'" (*Morgan*, *supra*, 42 Cal.4th at pp. 605-606.) In rejecting a facial vagueness challenge to an antigang injunction, the court stated, "a claim that a law is unconstitutionally vague can succeed *only* where the litigant demonstrates … that the law is vague as to her or 'impermissibly vague *in all of its applications*.' [Citations.]" (*People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1116.) In rejecting a facial vagueness challenge to an ordinance banning camping in designated public areas, the court stated, "'"petitioners must demonstrate that the act's provisions inevitably pose a present total and fatal conflict with applicable constitutional prohibitions."' [Citations.]" (*Tobe, supra*, 9 Cal.4th at p. 1084.) And in rejecting a vagueness challenge to the statutory definition of insanity, the court stated, "'to succeed on a facial vagueness challenge to a legislative measure that does not threaten constitutionally protected conduct … a party must … demonstrate that "the law is

---

**2**At oral argument, counsel for the State of California readily acknowledged the need for a scienter requirement.

9.

impermissibly vague *in all of its applications*."' [Citations.]" (*People v. Kelly* (1992) 1 Cal.4th 495, 534.)

I thus would hold the stricter "void in all applications" test applicable to this preenforcement facial vagueness challenge. Hence, the precise constitutional issue presented is whether the "principally for use" in handguns language is impermissibly vague in all of its applications.

**Application of the Standard of Review to the Challenged Provisions**

I think the "principally for use" in handguns language sufficiently certain to survive this preenforcement facial vagueness challenge for four reasons.

First, I would apply the rule that statutes are to be construed, if their language permits, so as to render them valid and constitutional rather than invalid and unconstitutional. (*Traverso v. People ex rel. Dept. of Transportation* (1993) 6 Cal.4th 1152, 1164.) Under this rule, in view of the large number of cartridges that potentially fall within the challenged language, I would infer a scienter element. (*In re Jennings* (2004) 34 Cal.4th 254, 267 [the requirement that the prosecution prove guilty knowledge is so fundamental to our criminal justice system that penal statutes often are construed to contain a scienter element if they fail to state one expressly].) Further, I would limit the phrase "ammunition principally for use in pistols, revolvers and other firearms capable of being concealed upon the person" to ammunition that generally is recognized as used more often in handguns than in other types of firearms. (See, e.g., *Erlich v. Municipal Court* (1961) 55 Cal.2d 553, 559.)

Under that practical and commonsense construction, an ammunition purveyor would be liable criminally for failing to comply with the statutes only when he or she knows or should know that the ammunition displayed, sold, or transferred is ammunition principally for use in handguns because the ammunition generally is recognized as handgun ammunition.

10.

Second, in my view, the challenged language has an ascertainable meaning among members of an affected trade or profession. (§ 7, subd. 12.) Therefore, I would conclude that the Legislature reasonably could charge a handgun ammunition vendor of common intelligence with superior knowledge as to which cartridges of ammunition generally are recognized as principally for use in handguns. (*People v. Cramblit* (1978) 84 Cal.App.3d 437, 445.) And to the extent that section 30312, subdivision (a) [delivery or transfer of handgun ammunition must occur in a face-to-face transaction] is not limited to vendors, the addition of the scienter element would assure that lay persons have fair warning that the transfer of ammunition that is recognized as handgun ammunition must comply with the challenged provisions. If an individual is truly ignorant of the principal use of the ammunition transferred, he or she may avoid potential liability by complying with the challenged provisions.

Third, I disagree that the phrase "principally for use" in handguns is unconstitutionally vague because it is not clear what information is required to make that determination. I agree that "principally for use" means used "for the most part" or "more than 50 percent of the time." The Legislature regularly has used terms such as "principally" and "primarily" to define prohibited conduct. (See, e.g., §§ 189, 243, subd. (f)(19), 498, subd. (c)(1); Civ. Code, § 1802.4; Ins. Code, § 11580.06, subds. (a), (d); Lab. Code, § 108.2, subd. (b)(3); Veh. Code, § 435.5; Bus. & Prof. Code, § 10133.1, subd. (a)(5); Fam. Code, § 852, subd. (c); *Suter v. City of Lafayette* (1997) 57 Cal.App.4th 1109, 1132-1133 [ordinance that required business proprietor to bar minors unaccompanied by a parent or guardian from remaining in a store where "'firearms sales activity is the primary business performed at the site'" was not unconstitutionally vague].)

*Hoffman Estates, supra*, 455 U.S. at pages 500-501 and *Posters 'N' Things, Ltd. v. United States* (1994) 511 U.S. 513, 521-522 are instructive. In those cases, the court

11.

reasoned that in determining an item's principal use, the court looked to the item's objective features and likely use.

Adding these components to the interpretation of the challenged language leads to the conclusion that ammunition "principally for use" in handguns means cartridges used more often in handguns than in other firearms by virtue of their objective characteristics and likely use. Thus, ammunition principally for use in handguns includes cartridges that by their objective characteristics or likely use give the ammunition handler of ordinary intelligence, vendor or not, fair notice that the ammunition transferred is handgun ammunition as targeted in the challenged statutes.

Further, because Internet ammunition vendors and a respected ammunition encyclopedia categorize a number of cartridges as handgun ammunition, I would conclude that the meaning of "ammunition principally for use in handguns" can be ascertained objectively.

Like the appellants in *Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188, 1201, respondents raise a host of questions regarding how to interpret the "principally for use" in handguns phrase. As the *Evangelatos* court did, I would decline to entertain these inquiries in this preenforcement facial challenge except to note that constitutional fair notice requires only a reasonable degree of certainty so that prosecution does not trap the innocent without fair warning. Here, fair notice requires a limiting construction so that handgun ammunition includes only those cartridges that generally are recognized as principally for use handguns. And, under a reasonable and practical construction of the statutes, ammunition handlers would not be charged with knowledge of all ammunition use across time and around the world.

Moreover, respondents' questions amount to hypertechnical inquiries. A statute is not unduly vague because its terms may be dissected to yield some ambiguity or uncertainty. (*People v. Heffner* (1977) 70 Cal.App.3d 643, 653.) While respondents may

12.

have legitimate questions about the applicability of the provisions to less familiar cartridges or cartridges that arguably are used equally in handguns and in rifles, courts recognize that the law is full of instances where a person's fate depends on his or her estimating correctly, that is, as the jury subsequently estimates it. (*Id.* at p. 654, citing *United States v. Powell* (1975) 423 U.S. 87, 93 (*Powell*).)

Fourth, I would find the challenged language, as construed, sufficiently certain to survive this challenge under federal and California precedent.

Regarding the fair notice prong of the void for vagueness doctrine, case law illustrates the specificity required in the description of the regulated conduct to avoid unconstitutional vagueness. In *Powell, supra,* 423 U.S. 87, the defendant, who had sent a 22-inch sawed-off shotgun through the mails, challenged her conviction for violating a federal law that proscribed mailing pistols, revolvers, and concealable weapons. She contended the phrase, "'other firearms capable of being concealed on the person,'" was unconstitutionally vague. (*Id.* at pp. 89-90.) The Supreme Court disagreed. That Congress might have chosen clearer and more precise language did not mean that the statute was unconstitutionally vague. (*Id.* at pp. 93-94.) Had Congress chosen to delimit the size of the firearms intended to be declared unmailable, it would have written a different and narrower statute than it wrote. (*Id.* at p. 94.)

Similarly, in *Morgan, supra*, 42 Cal.4th 593, the California Supreme Court considered whether the asportation element of simple kidnapping, which required movement of a "substantial distance," was unconstitutionally vague. (*Id.* at p. 604.) The court noted that the law was full of examples in which a person must conform his or her conduct to such nonmathematical standards as "prudent," "reasonable," "necessary and proper" and "substantial." (*Id.* at p. 606.) For example, an individual may be cited for speeding if he overestimates the "prudent or reasonable" speed to drive his car under the circumstances (Veh. Code, § 22350); another may be convicted of willful homicide if he

13.

misjudges the "reasonable amount" of force he may use in repelling an assault. But standards of this kind are not unconstitutionally vague if their meaning can be "objectively ascertained by reference to common experiences of mankind. [Citation.]" (*Morgan,* at p. 606.) The court concluded, in the context of the simple kidnapping statute, the phrase "substantial distance" meant a significant amount as opposed to a trivial distance and thus met the constitutional requirement of reasonable certainty. (*Id.* at pp. 606-607.)

In *Heffner*, *supra*, 70 Cal.App.3d 643, the court held that the statute that proscribed the carrying of a loaded weapon in a public place provided adequate notice that the carrying of a Taser armed for firing fell within its proscription. (*Id.* at pp. 653, 654-655.) The court reasoned that due process required only that "'the law give sufficient warning that men may conduct themselves so as to avoid that which is forbidden.' [Citation.]" (*Id.* at pp. 654-655.) And, the complexities of the social problems dealt with by the Legislature required the court give a practical construction to the language employed by the draftsmen, lest their legislative purposes be too easily nullified by hypertechnical inquiries into the meaning of words. (*Id.* at p. 649.)

Finally, in *Burg v. Municipal Court* (1983) 35 Cal.3d 257, the Supreme Court rejected a void for vagueness challenge to the statute making it illegal for a person to drive with a blood-alcohol content of 0.10 percent or more. The court held that "fair notice" required only that the violation be described with a "reasonable degree of certainty" so that prosecution did not "trap the innocent" without "fair warning." (*Id.* at pp. 270-271.) The court concluded that a person who drives a vehicle after ingesting sufficient alcohol to approach or exceed the proscribed level is neither innocent nor without fair warning. (*Id*. at p. 271.)

In my view, the challenged language, as construed and with an inferred scienter element, provides sufficient certainty so that prosecution does not trap the innocent. The

challenged provisions require ammunition purveyors to comply with the recordkeeping and face-to-face sale requirements when they transfer ammunition that is used for the most part in handguns, even though the particular ammunition also may be used in rifles.

The evidence introduced in the trial court as to the general understanding of the meaning of the phrase "handgun ammunition" was conflicting. While each respondent declared that he did not know and could not determine whether any ammunition was principally for use in handguns, each conceded in deposition testimony that, in his experience, certain cartridges were used more often in handguns than in rifles. Further, appellants' expert identified 16 cartridges as ammunition principally for use in handguns within the meaning of the challenged statutes and testified that few, if any, long guns (rifles) fire those cartridges. While the parties' identification of handgun ammunition did not agree necessarily, there was evidence that ammunition handlers were able to identify cartridges that were used more often in handguns and thus fell within the statutory definition of handgun ammunition. In addition, ammunition vendors' Web sites categorize cartridges for sale as handgun ammunition, pistol ammunition, rifle ammunition, and shotgun ammunition. And Cartridges of the World, a recognized ammunition reference encyclopedia that was cited by both parties, is divided into chapters by categories of ammunition and includes a section entitled, "Current Handgun Cartridges of the World." The logical inference from this evidence is that certain ammunition is recognized as handgun ammunition, despite its possible use in rifles.

Further, the challenged statutes are not fatally uncertain because they require individuals to consider their subjective experience to determine whether a particular cartridge is handgun ammunition under the provisions. Criminal statutes that govern conduct by subjective standards have been held to be sufficiently certain if their meaning can be objectively determined by common experience. (*Morgan*, *supra*, 42 Cal.4th at p. 606.)

15.

As I see it, the evidence that handgun vendors label a portion of their stock as "handgun ammunition" and that the ammunition encyclopedia includes a section entitled "Current Handgun Cartridges of the World" demonstrates that the meaning of "ammunition principally for use in handguns" can be determined objectively by reference to common life experiences. Accordingly, the phrase "principally for use" in handguns is not unconstitutionally vague. (*Morgan, supra,* 42 Cal.4th at p. 606.)

Under these authorities, with the inferred scienter requirement and the practical and commonsense construction proposed, I would conclude the statutes convey a sufficiently definite warning of the regulated conduct when measured by common understanding and practices so that those motivated to comply with the statutes have sufficient warning to avoid that which is forbidden. (*Heffner*, *supra*, 70 Cal.App.3d at pp. 654-655.)

Regarding the second void for vagueness claim of arbitrary enforcement, I would dispose of respondents' challenge summarily because it is preenforcement. This claim requires that statutory language be definite enough to discourage arbitrary and discriminatory enforcement.

Respondents speculate that enforcement officers will differ among themselves regarding which cartridges are principally for use in handguns, leading to the possibility of arbitrary and discriminatory enforcement. Unlike the situation in *Kolender*, where the petitioner repeatedly had been stopped and arrested under the challenged provision, here there is no evidence available to indicate whether the handgun ammunition provisions will be enforced in an arbitrary or discriminatory manner. Claims that the provisions will be applied arbitrarily or with the aim of inhibiting unpopular activity are speculative. (*Gonzales v. Carhart* (2007) 550 U.S. 124, 150.) I would decline to decide at this time whether speculative enforcement claims may jeopardize the statutes. (*Washington State Grange v. Washington State Republican Party* (2008) 552 U.S. 442, 449-450.)

16.

In conclusion, the determination of whether a particular cartridge is principally for use in handguns may be problematic given that many cartridges are used in both handguns and rifles. Under the principle of judicial restraint, however, I would consider those potential problems if and when they arise. Respondents' speculative arguments have not convinced me that the challenged provisions are incapable of any valid application. I would therefore hold that respondents have not demonstrated that the challenged provisions are unconstitutional on their face and would reverse the judgment of the trial court.

I have not expressed an opinion as to the issue of appellant's motion to tax costs as the reversal I have suggested would render that issue moot.

_____

CORNELL, Acting P.J.

17.